**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| ENCORE ENTERTAINMENT, LLC;<br>WARNER/CHAPPEL MUSIC, INC.;<br>WARNER/TAMERLANE PUBLISHING<br>CORP.; WB MUSIC CORP.; KEITH<br>FOLLESE; FOLLAZOO CREW MUSIC;<br>and FAMOUS MUSIC CORPORATION, | )<br>)<br>)<br>)<br>)<br>) | Case No. 3:03 1129 |
| | ) | |
| Plaintffs, | ) | |
| | ) | JUDGE TRAUGER |
| v. | ) | |
| | ) | |
| KIDDESIGNS, INC.; Priddis MUSIC, INC;<br>RICHARD L. Priddis; and MATTEL, INC, | )<br>) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM**</u>

Presently before the court are a number of motions concerning this labyrinthine copyright infringement case. Currently unresolved is the Motion for Summary Judgment filed by defendants Priddis Music, Inc., and Richard L. Priddis (hereinafter combined as defendant "Priddis") against the plaintiffs (Docket No. 121), to which the plaintiffs have responded (Docket No. 155), and Priddis has replied (Docket No. 195). Also related to Priddis's Motion for Summary Judgment are the following motions: (1) plaintiff's Motion to Exclude the Report and Testimony of Priddis's Marketing Expert, Dara Lupowitz (Docket No. 143), to which Priddis has responded (Docket No. 190); (2) plaintiff's Rule 37(c)(1) Motion to Bar Evidence and for Other Sanctions (Docket No. 145), to which Priddis has responded (Docket No. 189); and (3) Priddis's Motion to Strike Portions of the Declaration of Christos Badavas (Docket No.

1

191), to which the plaintiffs have responded (Docket No. 203). In addition, the plaintiffs have filed a Rule 11 Motion for Sanctions against Priddis (Docket No. 209), to which Priddis has responded (Docket No. 13).

Also pending are the Motion for Summary Judgment filed by defendant Mattel, Inc., against the plaintiffs (Docket No. 115), to which the plaintiffs have responded (Docket No. 151) and Mattel has replied (Docket No. 185), and the Motion for Partial Summary Judgment filed by Defendant KIDdesigns concerning its cross-claims for breach of contract and indemnification against defendant Priddis (Docket No. 108), to which defendant Priddis has responded (Docket No. 166) and KIDdesigns has replied (Docket No. 188). Priddis has likewise filed a Motion for Summary Judgment as to KIDdesigns' cross-claims (Docket No. 122), to which KIDdesigns has responded (Docket No. 163) and Priddis has replied (Docket No. 193). Finally, plaintiff Follese has filed a Motion to Reopen Discovery (Docket No. 175), to which defendants KIDdesigns, Mattel, and Priddis have responded (Docket Nos. 200, 202), and Follese has replied (Docket No. 207).

In the interests of efficiency, the court has consolidated its analysis and rulings as to each of the aforementioned  motions in the memorandum below.


I.      FACTS AND PROCEDURAL HISTORY

Defendant KIDdesigns is in the business of manufacturing and selling electronic, audio and video products intended for use by children and often sold under trademarks that KIDDesigns has licensed from third parties.  (Docket No. 168, Priddis's Response to KIDdesigns's Statement of Undisputed Facts, at ¶ 2)  Among the companies that license

2

KIDdesigns' products is Mattel, the owner of the world-famous Barbie® trademark. (Docket No. 154, Plaintiff's Response to Mattel's Statement of Undisputed Facts, at ¶ ¶  2, 5)   This lawsuit concerns seven audio products, including a "Sing With Me" karaoke machine, a karaoke boombox, and a personal tape player (Docket No. 152 at Exh. 6), manufactured, distributed and sold either by or at the direction of KIDdesigns, bearing the model numbers BE-417, BE-445, BE-466, BE-477, BE-488, BE-494, and BE-497, as well as the Mattel Barbie® trademark (hereinafter the "disputed products") (Docket No. 168 at ¶ 3; Docket No. 154 at ¶ 11).   All of the disputed products sold between 2001 and early December 2003 were distributed with cassettes or CDs containing various musical compositions.  (Docket No. 168 at ¶ 4; Docket No. 154 at ¶ 12)   Among these musical compositions were certain works in which plaintiffs, a group consisting of various music publishers and an individual songwriter, have an ownership or administrative interest.  *Id*.   Specifically, these interests lie in seven popular compositions titled "The Way You Love Me," "Footloose," "Music," "Believe," "We are Family," "Everything You Want," and "I Got you Babe" (hereinafter "subject compositions").  (Docket No. 154 at ¶ 13; Docket No. 137)

The master DAT recordings used to create the cassettes and CDs that were ultimately included in the disputed products were supplied to defendant KIDdesigns by co-defendant Priddis  (Docket No. 168 at ¶ 5; Docket No. 154 at ¶ 15), a karaoke recording company in the business of producing master karaoke sound recordings.  (Docket No. 157, Plaintiff's Response to Priddis' Statement of Undisputed Facts, at ¶ 5)  To make the master DAT recordings, Priddis combined previously authorized master sound recordings into single compilations (hereinafter

3

"the Barbie® compilations").[1]  *Id*. at ¶ 8.  The master DAT recordings were then sent to Hong

Kong,[2] where they were reproduced on cassettes and CDs, with titles such as "Party Hits,"

"Female Favorites," "Male Hits, "Female Top Hits," "Male Artists" and "Top Hits."   (Docket

No. 196, Exhibit B, Confidential Deposition of Peter Felberbaum, at pp. 96, 250)  These

cassettes and CDS were later packaged, marketed, and distributed, both domestically and

internationally, with the disputed products.

On November 25, 2003, the plaintiffs filed a Complaint in this court, alleging that the

defendants' conduct in connection with the disputed products constituted copyright

infringement, in violation of the Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq*. (Docket No. 1)

On March 1, 2004, the plaintiffs filed an Amended Complaint (Docket No. 59), and, on April 12,

2005, the plaintiffs filed a Second Amended Complaint (Docket No. 138).

With respect to the conduct of defendant Priddis, the plaintiffs acknowledge that Priddis,

on previous occasions, had acquired mechanical licenses from the plaintiffs for the reproduction

and distribution of the subject compositions through the plaintiffs' mechanical licensing agent,

the Harry Fox Agency.[3]  However, the plaintiffs claim that Priddis' actions with respect to the

---

[1]The recordings, or "tracks," used by Priddis in making the Barbie® compilation were versions of the subject compositions previously produced by Priddis using studio facilities, vocalists, musicians, and engineers engaged on behalf of and compensated by Priddis Music.  *Id*. at ¶ 9.

[2]While Priddis initially represented that the master DAT recordings were sent directly to Hong Kong by Priddis (Docket No. 124, Exhibit B, Deposition of Richard L. Priddis, at p. 22), this representation was later rescinded (Docket No. 197, Declaration of Richard L. Priddis, at ¶ 10)  According to Peter Felberbaum, the Executive Vice President of Marketing and Licensing at KIDdesigns, Priddis shipped the master DAT recordings to KIDdesigns, who then shipped them to Hong Kong.  (Docket No. 196, Exh. B, Felberbaum Depos. at pp. 96, 250, 373)

[3]Most music publishers employ the Harry Fox Agency, Inc. (hereinafter "HFA") as their agent to issue licenses on their behalf and to collect and distribute royalties.  AL KOHN & BOB

4

Barbie® compilation exceeded the scope of those licenses, thereby infringing upon its copyright

interest. Plaintiffs further contend that such infringement was willful, in violation of 17 U.S.C. §

504(c)(2).

KIDdesigns, on the other hand, has conceded, following the close of discovery, that it is

liable for non-willful copyright infringement with respect to four of the subject compositions at

issue.[4] (Docket No. 153, Exhibit 1) Though KIDdesigns has conceded its own liability for

copyright infringement, it contends that Priddis is responsible for indemnifying KIDdesigns

against all claims of copyright infringement made by the plaintiffs in this case, as well as other

third-party copyright owners with interests in other compositions included in the disputed

products.[5] To that end, on January 12, 2004, KIDdesigns filed a cross-claim against Priddis for

indemnification, breach of contract, and fraud.[6] While it is undisputed that KIDdesigns and

KOHN, KOHN ON MUSIC LICENSING 16 (3d ed. 2002)

[4]KIDdesigns has not conceded liability for copyright infringement with respect to two of
the subject compositions at issue, "We are Family" and "Believe." (Docket No. 153, Exhibit 1)
However, plaintiffs Warner/Chappel Music, Inc., Warner/Tamerlane Publishing Corp., WB
Music Corp, and Encore Entertainment and defendants KIDdesigns and Mattel have settled all
claims existing between them and, thus, all claims asserted by plaintiffs Warner/Chappel,
Warner/Tamerlane, WB Music, and Encore Entertainment have been dismissed with prejudice
by Agreed Orders. (Docket Nos. 77, 198) Thus, plaintiffs Follese and Famous Music, Inc.,
whose interests lie only in subject compositions "The Way You Love Me" and "Footloose," are
the only remaining plaintiffs with copyright infringement claims against defendants KIDdesigns
and Mattel. KIDdesigns has conceded liability as to these compositions. Mattel's liability,
however, is the subject of a Motion for Summary Judgment, discussed herein.

[5]KIDdesigns contends that it has been forced to pay out more than $3.8 million in back
royalties to various non-party music publishers in connection with the disputed products.
(Docket No. 110 at p. 2–3)

[6]On February 9, 2004, Priddis likewise filed cross-claims against KIDdesigns for breach
of contract, breach of implied covenant of good faith and fair dealing, and fraud. (Docket No.
54) Priddis' claims for breach of implied covenant of good faith and fair dealing and fraud have
since been resolved and dismissed with prejudice, along with KIDdesigns' third cross-claim for

Priddis entered into at least one contract by which Priddis agreed to provide KIDdesigns with the master DAT recordings for use in the disputed products, the terms and enforceability of this agreement are the subject of cross-motions for summary judgment on KIDdesigns' cross-claims for indemnification and breach of contract, filed contemporaneously on April 1, 2005, by KIDdesigns and Priddis. (Docket Nos. 108, 122)

Also on April 1, 2005, defendant Mattel filed a Motion for Summary Judgment with respect to its own liability for copyright infringement. While Mattel acknowledges that KIDdesigns did not have a legal right to incorporate the subject compositions onto cassettes and CDs to be sold with the disputed products (Docket No. 117, at p. 2), it asserts that Mattel cannot be held responsible for such infringement under theories of either contributory or vicarious copyright infringement.

On April 26, 2005, plaintiff Follese filed a Motion to Reopen Discovery for Limited Disclosure (Docket No. 175)  The defendants oppose the reopening of discovery, arguing that Follese's Motion is truly a Motion to Amend.  According to the defendants, the Motion should be denied because the proposed amendment would be futile.

## II.     ANALYSIS

A.     Priddis' Motion for Summary Judgment Against the Plaintiffs

Priddis first argues that the plaintiff's claims for copyright infringement cannot survive

---

fraud.  (Docket No. 140)  Priddis' remaining claim for breach of contract is not currently before the court.

summary judgment because Priddis had licenses for all the subject compositions during the disputed time. (Docket No. 134 at p. 1) In the alternative, Priddis asserts that, even if its conduct qualifies as infringing, the infringement has since been cured by Priddis' securing of retroactive licenses specifically covering the Barbie® compilations and, moreover, any such past infringement cannot constitute "willful" infringement because Priddis' conduct was based upon the existence of licenses and upon industry custom. *Id*. at pp. 6–7. Finally, Priddis argues that plaintiff's claims are barred under a theory of equitable estoppel because, according to Priddis, the plaintiffs repeatedly allowed alleged past infringers to cure discrepancies in licensing agreements with retroactive licenses and have accepted the payment of past due royalties to cure the claimed copyright infringement. *Id*. at p. 8.

1. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not

7

to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537–38 (6th Cir. 1999).

To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. *Id.* at 255.

The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52). "There is no genuine issue for trial unless the nonmoving party has produced enough evidence for a jury to be able to return a verdict for

8

that party." *Tinsley v. General Motors Corp.*, 227 F.3d 700, 703 (6th Cir. 2000).  If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted.  *Anderson*, 477 U.S. at 249–52.  "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citations omitted).

### 2. *Scope of Licenses*

It is undisputed that Priddis received from HFA various mechanical licenses to use the subject compositions.[7]  Contrary to Priddis' assertions, however, obtaining a license to use a copyrighted work does not necessarily preclude a copyright owner from succeeding on a claim of copyright infringement.  A licensee infringes an owner's copyright if its use exceeds the scope of the license afforded.  *See Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995), citing *Gilliam v. American Broadcasting Cos.*, 538 F.2d 14, 20 (2d Cir. 1976).  Thus, "[t]he critical question is not the existence but the scope of the license."  *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088–87 (9th Cir. 1989).

"Copyright disputes involving only the scope of the alleged infringer's license present the court with a question that essentially is one of contract: whether the parties' license agreement encompasses the defendant's activities."  *Bourne*, 68 F.3d at 631.  Thus, in order to resolve this issue, the court must carefully examine the terms of the HFA licenses granted to Priddis.  While the court relies on state law to provide the canons of contractual construction, such laws are

---

[7]A mechanical license is a grant to use the copyrighted work in the manufacture and distribution of phonorecords.

relied upon only to the extent that they do not interfere with federal copyright law or policy. *S.O.S.*, 886 F.2d at 1088, citing *Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.*, 661 F.2d 479, 482–83 (5th Cir. 1981). In other words, "the license must be construed in accordance with the purposes underlying federal copyright law." *Cohen v. Paramount Pictures, Corp.*, 845 F.2d 851, 854 (9th Cir. 1988).

The HFA licenses obtained by Priddis for the subject compositions are identical in form. On the front side of each HFA license is the following language: "Refer to the provisions hereof reproduced on reverse side varying terms of compulsory license provision of Copyright Act. The following is supplementary thereto: ..." The license then lists, in Sections "A" and "B," information about the musical composition at issue, such as the song code, title, writer(s), and publisher(s). In Section "C," the license specifies the record number, artist, and royalty rate, as well as the playing time. Section "D," titled "Additional Provisions," states, in each of the licenses, that:

> THE AUTHORITY HEREUNDER IS LIMITED TO THE MANUFACTURE AND DISTRIBUTION OF PHONORECORDS SOLELY IN THE UNITED STATES, ITS TERRITORIES AND POSSESSIONS AND NOT ELSEWHERE.
>
> CREDIT: IN REGARD TO ALL PHONORECORDS MANUFACTURED, DISTRIBUTED AND/OR SOLD HEREUNDER, YOU SHALL USE YOUR BEST EFFORTS TO INCLUDE IN THE LABEL COPY OF ALL SUCH PHONORECORDS, OR ON THE PERMANENT CONTAINERS OF ALL SUCH PHONORECORDS, PRINTED WRITER/PUBLISHER CREDIT IN THE FORM OF THE NAMES OF THE WRITER(S) AND THE PUBLISHER(S) OF THE COPYRIGHTED WORK.

Section "D" also contains a listing of the album title, the date of release, the configuration code, such as "CD," "LP," or "cassette tape," and the royalty rate, stated as a percentage of the statutory royalty rate. The following language is included on the reverse side

10

of the license:[8]

    1. You have advised us that you wish to obtain a compulsory license to make and to distribute phonorecords embodying a single performance of the Composition under the compulsory license provisions of Section 115 of the United States Copyright Act (the "Copyright Act").

    2. Upon your doing so, you shall have all the rights which are granted to, and all the obligations which are imposed upon, users of a copyrighted work under the compulsory license provisions of the Copyright Act, after phonorecords of the copyrighted work have been distributed to the public in the United States under the authority of the copyright owner, except that with respect to phonorecords thereof made and distributed hereunder:

    A. You shall pay royalties and account to us quarterly, within forty-five (45) days after the end of each calendar quarter, on the basis of phonorecords made and distributed;

    B. For such phonorecords made and distributed, the royalty shall be the statutory compulsory mechanical royalty rate in effect at the time the phonorecord is distributed (the "statutory rate"), except as otherwise stated herein;

    C. This compulsory license covers and is limited to one particular recording of the Composition as performed by the artist and on the phonorecord number identified above; ....

    3. The license set forth herein is a compulsory license under the provisions of the Copyright Act (Section 115) and may be utilized only for phonorecords embodying recordings to which you have the lawful right of reproduction.

    4. The rights granted herein are limited to the United States, its territories and possessions....

All of the HFA licenses list specific record numbers, album titles, release dates, and

configurations.

    The plaintiffs claim that Priddis has exceeded the scope of these licenses because, under

the express terms of the HFA licenses, Priddis' use of the subject compositions was confined to

---

[8]Priddis failed to provide the court with the full text of the terms and provisions of the HFA mechanical licenses for the subject compositions. Despite the fact that the front portion of the license explicitly states that it is "supplementary" to the provisions stated on the reverse side, Priddis submitted only the front side of the license in support of its Motion for Summary Judgment. In response to Priddis' Motion for Summary Judgment, the plaintiffs submitted the omitted portions of the HFA licenses.

11

the designated record numbers and/or album titles identified on the licenses. Thus, according to the plaintiffs, Priddis' use of the subject compositions in making the Barbie® compilations for the albums contained in the disputed products, with titles not specified on the licenses, was unauthorized.

Here, the language of the subject licenses states that, "This compulsory license covers and is limited to one particular recording of the Composition as performed by the artist *and on the phonorecord number identified above*..." (emphasis added). Above, on the front page of the subject licenses, the exact record number and album title is identified.[9] The listing of a specific record number and album title on the subject licenses, as opposed to simply a master recording number, is significant.[10] *Kohn on Music Licensing* explains that:

> By using the record number, rather than the master number, you will have narrowed the scope of the license to permission to make reproductions of the particular album on which the song was intended to initially appear, rather than any record made from recordings appearing in the master. If the master is later used, as, for example... in using recordings from the master in other record albums, the recording company would then be required to obtain an additional license from the copyright owner to use the recording for the new use.

AL KOHN & BOB KOHN, KOHN ON MUSIC LICENSING 698–99 (3d ed. 2002).

Thus, *Kohn* advises music copyright owners to ask the licensee for the record number, rather than the master number, when completing a mechanical license.

The Second Circuit has similarly expressed, in *Fred Ahlert Music Corp. v.*

---

[9]For example, the HFA license covering the composition "The Way You Love Me" lists "(CS) 1390; (CD) 1390G" as the record number and "Sing Like A Star" as the album title.

[10]The "record number" identifies the particular phonorecording made from the master, while the "master number" is the number established at the recording studio for identification and filing purposes when the recording master is completed.

12

*Warner/Chappell Music, Inc*., 155 F.3d 17, (2d Cir. 1998), that, when a license expressly grants a limited right to use a composition for a particular record number, additional releases of the composition are not authorized. In *Ahlert*, the court examined the scope of the derivative works exception of the Copyright Act, 17 U.S.C § 304(c)(6)(A),[11] in determining which music publisher, Ahlert or Warner/Chappell, had the right to license the use of a 1969 Joe Cocker recording, a derivative work based upon the copyrighted musical composition "Bye Bye Blackbird," for use on a soundtrack for the motion picture "Sleepless in Seattle." 155 F.3d at 19. Warner/Chappell Music, the copyright owner at the time that the Joe Cocker derivative was recorded, had issued a mechanical license, giving A & M Record Company the right to make and distribute the 1969 recording. *Id*. Years later, however, the defendant's copyright interest was terminated and transferred to plaintiff Ahlert. *Id*. at 20. The defendant argued that, because the use of the Joe Cocker derivative on the "Sleepless in Seattle" soundtrack fell within the derivative works exception to the Copyright Act, the right to license the use of the song for use on the soundtrack and collect royalties had not been transferred to the plaintiff with the copyright ownership. *Id*. at 20–22.

The court found that the ownership of the rights to use of the Joe Cocker recording on the soundtrack turned on the terms of the grant from the defendant to A & M. *Id*. In other words, if the inclusion of the Cocker derivative on the soundtrack and soundtrack album constitutes "utiliz[ation] under the terms of the grant" given by

---

[11]The Derivative Works Exception holds, in pertinent part, that "A derivative work prepared under the authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination...." 17 U.S.C. § 304(c)(6)(A).

13

defendant to A & M, then such use would fall within the Derivative Works Exception. The court, finding that the use of the derivative did not fall within the terms of the grant, stated:

> [The mechanical] license [was] a narrow one granting A & M the right to use "Bye Bye Blackbird" for the limited purpose of recording the Cocker derivative and releasing it as "Record No. SP 4182". [sic] This grant does not authorize any additional releases of the Cocker derivative, much less its inclusion on a movie soundtrack.

*Id*. In conclusion, since the scope of the mechanical license was limited to the specific record number identified in the licensing document, the release of the Joe Cocker derivative on the soundtrack did not fall within the derivative works exception to the Copyright Act.

The language of the licenses at issue here, like that in *Ahlert*, is exceedingly narrow. As stated above, the HFA licenses state: "This compulsory license covers and is limited to one particular recording of the Composition as performed by the artist *and on the phonorecord number identified above;*...." (emphasis added). Thus, the grant to Priddis pursuant to the HFA licenses is restricted to those specific phonorecord numbers identified in the licenses and did not authorize Priddis' use of the subject compositions in connection with the making of the master DAT recordings for the Barbie® albums included in the disputed products.

Priddis attempts to distinguish the *Ahlert* case on the grounds that the license there stated that it "covers *only* the particular recording, mentioned herein." Docket No. 195 at p. 4, citing *Fred Ahlert Music Corp. v. Warner/Chappell Music Inc*., 958 F. Supp. 170, 173 (S.D.N.Y. 1997) (emphasis added). This birds-eye distinction, however, is one entirely without a difference. Furthermore, the court's interpretation of the subject licenses is compatible with the decision of a

14

district court in *The Rodgers and Hammerstein Org. v. UMG Recordings, Inc*., No. 00-CIV.9322(JSM), 2001 WL 1135811, at *6 (S.D.N.Y. Sept. 26, 2001), in which the court analyzed the same exact HFA license language currently before this court, in connection with a copyright infringement case brought by music publishers and songwriters against a recording company, UMG Records, and The Farm Club Online. The case centered around the defendants' reproduction of sound recordings of plaintiffs' works onto their computer servers for the purpose of allowing consumers to access the sound recordings on demand. The plaintiffs claimed that such use of their works was not authorized and that they were not being paid royalties due for such use. The defendants, in turn, argued that, because they held compulsory HFA licenses (in the same form as the subject licenses at issue here), they had an absolute defense to the plaintiffs' infringement claim. The court rejected this argument, finding that the HFA licenses held by the defendants were limited to the express configurations and record numbers identified in the HFA licenses. Comparing the language to that in *Ahlert*, the court found:

> The language on the HFA documents is similarly narrow and is subject to the same [*Ahlert*] analysis. As mentioned above, the HFA form states: "This compulsory license covers and is limited to one particular recording of said copyrighted work as performed by the artist and on the phonorecord number identified [on the document]." Thus the language of the HFA document is narrowly limited to a specific phonorecord number.

As in *Ahlert* and *Hammerstein*,[12] the court finds that the language of the subject licenses is narrowly limited, giving Priddis only the authorization to manufacture and distribute phonorecords of the subject compositions on the record numbers specified in the license, and

---

[12]This court, like some other courts, is struck by the fact that there is so little authority on these important copyright issues.

Case 3:03-cv-01129   Document 228   Filed 09/14/05   Page 15 of 48 PageID #: 127

with the designated album titles.

       3. *Retroactive Licensing*

       Priddis next asserts that, even if the initial licenses obtained by Priddis did not authorize the making of the Barbie® compilation for use on the Barbie® albums, the retroactive licenses it obtained electronically from HFA in January of 2005, which specifically authorize the use of the subject compositions for the Barbie® albums, cured any resulting copyright infringement. However, these retroactive electronic licenses are the subject of a Rule 37(c)(1) Motion to Bar Evidence and For Other Sanctions filed by the plaintiffs on April 20, 2005.  (Docket No. 145)

       (a) Plaintiff's Rule 37(c)(1) Motion to Bar Evidence

       The plaintiffs move this court to exclude the retroactive licenses, as well as copies of royalty reports related to the retroactive licenses, from consideration in support of Priddis' Motion for Summary Judgment, and to issue appropriate sanctions, pursuant to Rule 37(c)(1). According to the plaintiffs, Priddis did not comply with the supplementing requirements of Rules 26(e)(1) and (e)(2) by failing to correct the November 9, 2004, deposition testimony of Richard Priddis, in which he stated that Priddis had not obtained any licenses authorizing the Barbie® compilation and/or albums nor paid any royalties associated therewith, even though five of the electronic retroactive licenses bear the date of September 9, 2004, and the royalty report documents indicate that they relate to the reporting period for the close of the calendar quarter of September 30, 2004.  *Id*. at ¶¶ 6, 13.   While most of the retroactive electronic licenses bear the date of September 9, 2004, they all, with the exception of the retroactive license for "Believe," have a "Signed Status" date of January 1, 2005.  (Docket No. 145, Attachment 2, Declaration of Christos Badavas at ¶ 5)  Badavas, Vice President and Senior Counsel to HFA, explained that the

fully executed license forms, obtained via HFA's automated electronic licensing system, is given

a "Signed Status" date when it is returned to HFA with the applicant's countersignature. *Id*. at ¶

3. Federal Rules of Civil Procedure 37(c)(1) provides that:

> A party that without substantial justification fails to disclose information required
> by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required
> by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as
> evidence at a trial, at a hearing, or on a motion any witness or information not so
> disclosed. In addition to, or in lieu of this sanction, the court on motion and after
> affording an opportunity to be heard, may impose other appropriate sanctions....

Fed. R. Civ. P. 37(c)(1). Thus, the party seeking to invoke the preclusion sanction of Rule

37(c)(1) must first prove that the opposing party violated either Rule 26(a) or (e). *Id*; *see also*

*Moore's Federal Practice*, § 37.60[2][a].

The plaintiffs here cannot prevail under Rule 37(c)(1) because they cannot establish a

violation of Rules 26(e)(1) or (e)(2), the rules it alleges Priddis failed to follow. Rule 26(e)

states that:

> A party who has made a disclosure under subdivision (a) or responded to a
> request for discovery with a disclosure or response is under a duty to supplement
> or correct the disclosure or response to include information thereafter acquired if
> ordered by the court or in the following circumstances:
> (1) A party is under a duty to supplement at appropriate intervals its disclosures
> under subdivision (a) if the party learns that in some material respect the
> information disclosed is incomplete or incorrect and if the additional or corrective
> information has not otherwise been made known to the other parties during the
> discovery process or in writing. With respect to testimony of an expert from
> whom a report is required under subdivision (a)(2)(B) the duty extends both to
> information contained in the report and to information provided through a
> deposition of the expert....
> (2) A party is under a duty seasonably to amend a prior response to an
> interrogatory, request for production, or request for admission if the party learns
> that the response is in some material respect incomplete or incorrect and if the
> additional or corrective information has not otherwise been made known to the
> other parties during the discovery process or in writing.

17

Fed. R. Civ. P. 26(e).  Because the information regarding the retroactive electronic licenses and related royalty payments was made available to the plaintiffs before the end of discovery, as the plaintiffs acknowledge (Docket No. 145 at ¶¶ 3, 8), Priddis did not violate the supplemental disclosure requirements of either Rule 26(e)(1) or (e)(2).  *See Committee Notes on Rule 26, subdivision (e)* ("There is, however, no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process....").  Moreover, the supplementing duties of Rule 26(e) do not extend to deposition testimony, other than that of expert witnesses.  *Moore's Federal Practice* § 26.131[1].  *See also* Advisory Committee Notes to Federal Rule of Civil Procedure 26(e) ("The revision also clarifies that the obligation to supplement responses to formal discovery requests applies to interrogatories, requests for production, and requests for admissions, but not ordinarily to deposition testimony.").  Because Priddis is not prohibited from relying on the retroactive licenses in support of its Motion for Summary Judgment, the court will next address the merits of its argument that the retroactive licenses are curative.

(b) Effect of Retroactive Licensing

No federal circuit court has yet to address the issue of whether retroactive licenses can validate earlier acts of unlicensed copyright infringement, and there is a disagreement among district courts as to this point of law.  *Compare Leicester v. Warner Bros*., No. CV95-4058-HLH, 1998 WL 34016724, at *1506 (C.D.Cal. May 29, 1998) ("reject[ing] the idea that the earlier infringement can be retroactively validated by the later grant of the license.") *and David v. Showtime/The Movie Channel, Inc*., 697 F. Supp 752, 764 (S.D.N.Y. 1988) (dismissing affirmative defense based on application for retroactive license, in part, because "recognition of

18

the subsequent filing of an application for a "retroactive" license as a defense for prior infringing conduct would eviscerate the protections inherent in the copyright scheme.") *with Lone Wolf McQuade Assocs.*, 961 F. Supp. 587, 587–98 (S.D.N.Y. 1997) (holding that television programs did not infringe plaintiff's copyright because producer-defendants received a valid retroactive license from a third party joint copyright owner) *and SBK Catalogue P'ship v. Orion Pictures Corp.*, 723 F. Supp. 1053, 1059 (D.N.J. 1989) (referring to the court's prior decision in which it found that a joint copyright owner was "entirely within its rights to grant a retroactive license to the Orion defendants and that an authorization from one joint copyright owner is an effective defense to an infringement action brought by another joint owner.").

The court agrees with the conclusions of *Leicester* and *Showtime* and further notes that, to find otherwise, would promote a scenario whereby individuals would be permitted, if not encouraged, to willingly infringe upon a copyright interest until caught and then, once caught, simply apply for a retroactive license to avoid liability for earlier infringement. Such a scheme would plainly contradict the purposes underlying federal copyright law. More importantly, for purposes of this case, is the fact that these electronically obtained licenses have since been revoked by HFA. (Docket No. 156, Exhibit 4, Declaration of Christos Badavas[13] at ¶ 7).

---

[13]Portions of this Declaration are the subject of a Motion to Strike filed by defendant Priddis on May 9, 2005. (Docket No. 191) However, the portions of the Badavas Declaration with which Priddis takes issue are not inadmissible hearsay because they are not being offered for the truth of the matter asserted– that the disputed products were manufactured outside of the United States and that the master recordings made by Priddis were to be used in conjunction with sales of the Barbie® toys– but rather reflect Badavas' state of mind or reasoning in revoking the retroactive licenses. Regardless, the court need not rely upon these statements for the truth of the matters asserted, because such truths have been fully admitted to by Priddis. (Docket No. 156, Exhibit 9, Richard Priddis Depos. at pp. 21–25, 183, 288; Docket No. 203, Exhibit A, Richard Priddis Aff. at ¶ 3) To the extent the Badavas Declaration contains any improper legal conclusions regarding the scope of the Copyright Act, the court will not, in ruling on the motions

19

Because no retroactive licenses currently exist, Priddis' argument has dissolved into a legal nullity.

Finally, even if such retroactive licenses remained in existence and were curative in nature, a genuine issue of fact remains as to whether Priddis' conduct fell outside the territorial scope of even these retroactive licenses. *See Curb v. MCA Records, Inc.*, 898 F. Supp. 586, 595 (M.D. Tenn. 1995) (reproduction of a copyrighted work by a copyright licensee for distribution into unauthorized territory abroad may amount to primary infringement of a licensor's exclusive rights under the Copyright Act). *See also Expediters Int'l v. Washington, Inc*., 995 F. Supp. 468, 476–77 (D.N.J. 1998). Both the initial licenses and the retroactive licenses expressly state that "The authority hereunder is limited to the manufacture and distribution of phonorecords solely in the United States, its territories and Possessions and not elsewhere."[14] The plaintiffs assert that, because the master DAT recordings made by Priddis for use in the Barbie® toys were, as admitted by both Priddis and KIDdesigns, intended to be sent to Hong Kong for further replication by KIDdesigns' Hong Kong contractor and were ultimately included in the various disputed products for both domestic and international distribution, the replication of the subject compositions was outside the territorial scope of the HFA licenses.

While Priddis initially represented that the master DAT recordings were sent directly to Hong Kong by Priddis (Docket No. 124, Exhibit B, Deposition of Richard L. Priddis, at p. 22), this representation was later rescinded (Docket No. 197, Declaration of Richard L. Priddis, at ¶

_____

before it, rely upon it. Priddis' Motion to Strike will be denied.

[14]The initial licenses additionally state, on the reverse side of the first page, that "The rights granted herein are limited to the United States, its territories and possessions."

10)  According to Peter Felberbaum, the Executive Vice President of Marketing and Licensing at

KIDdesigns, Priddis shipped the master DAT recordings to KIDdesigns, who then shipped them

to Hong Kong.  At the very least, however, the evidence establishes that Priddis reproduced the

subject compositions on the Barbie® compilation and distributed the master DAT recording to

KIDdesigns with the intent and knowledge that the tape would be sent to Hong Kong for further

replication and distribution internationally and domestically.  (Docket No. 156, Exhibit 9,

Richard Priddis Depos. at pp. 21–25, 183, 288)  Thus, there is at least a genuine issue of fact as

to whether Priddis infringed upon the plaintiffs' copyright, either by reproducing the master

DAT recording for further reproduction and distribution abroad or by authorizing KIDdesigns to

commit infringing acts abroad.[15]

        Defendant Priddis does not appear to dispute that its actions violated the territorial scope

of the HFA licenses.  (Docket No. 195)  Priddis does contend, however, that any actions outside

the scope of the HFA licenses (retroactive or otherwise) were *de minimis* and, thus, unactionable,

because Priddis made only one master copy of each allegedly infringing album and "[i]t was

KIDdesigns that, in turn, used these master copies to make and distribute thousands of CDs and

cassettes."  *Id.* at p. 5.  In other words, according to Priddis, the principal acts complained of

were not performed by Priddis and, as a result, Priddis should not be held accountable for its

_____

        [15]While plaintiffs do not argue that Priddis' sublicensing of use of the subject
compositions to KIDdesigns, in and of itself, constituted infringement, the court notes that
Priddis may have violated the copyright owners' exclusive rights of authorization by doing so.
*See Expediters Int'l v. Washington, Inc.*, 995 F. Supp. 468, 476–77 (D.N.J. 1998) (adopting
holding in *Curb*, and finding that the mere authorization of infringing acts is direct infringement
actionable under United States Copyright Law); *see also Major League Baseball Promotion
Corp. v. Colour-Tex, Inc.*, 729 F. Supp. 1035, 1042 (D.N.J. 1990) ("both a licensee and a
sublicensee are liable for acts carried out by the sublicensee which would constitute infringement
of the licensor's rights when the licensor has not authorized the sublicensing agreement.").

minor acts of copyright infringement.

In *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 74 (2d Cir. 1997), the Second Circuit explained that, "[i]n the context of copyright law, the concept of *de minimus* has significance in three respects, which, though related, should be considered separately." The court observed that *de minimis* in the copyright context can be: (1) a technical violation of a right so trivial that the law will not impose legal consequences; (2) copying that has occurred to such a trivial extent as to fall below the quantitative threshold of substantial similarity; and (3) relevant to the defense of fair use. 126 F.3d at 74–75. Priddis cites to only the first of these meanings in support of its argument in favor of its *de minimis* defense.

Yet, Priddis' conduct in creating master DAT recordings of several different compilations of the subject compositions for use in the reproduction and distribution of the Barbie® albums in the hundreds of thousands cannot rightfully be characterized as "a technical violation of a right so trivial" as to not warrant the imposition of legal liability. Even if Priddis' actions could be deemed minimal, as *Nimmer on Copyright* rightfully observes, "the overwhelming thrust of authority upholds liability even under circumstances in which the use of the copyrighted work is of minimal consequence." *Nimmer on Copyright*, § 2:801[G]. This court likewise agrees that, "among the several potential meanings of the terms *de minimis*, the defense should be largely limited to its role in determining either substantial similarity or fair use." *Id.* For the foregoing reasons, Priddis' Motion for Summary Judgment will be denied as to the plaintiff's copyright infringement claims.

4. *Willful Infringement*

Priddis next argues that, even if its conduct may constitute copyright infringement, it can

not, as a matter of law, qualify as *willful* copyright infringement.  If a copyright infringer is found to have acted "willfully," the plaintiff may be entitled to collect enhanced statutory damages under the Copyright Act.  17 U.S.C. § 504(c)(2).  If the court finds that the infringement was innocent, on the other hand, the court may reduce the damages.  *Id*.  In *Princeton University Press v. Michigan Document Services*, 99 F.3d 1381, 1392 (6th Cir. 1996), the Sixth Circuit, quoting *Nimmer On Copyright*, stated the standard for determining "willful" copyright infringement:

> It seems clear that as here used, 'willfully' means with knowledge that the defendant's conduct constitutes copyright infringement.  Otherwise, there would be no point in providing specially for the reduction of minimum awards in the case of innocent infringement, because any infringement that was nonwillful would necessarily be innocent.  This seems to mean, then, that one who has been notified that his conduct constitutes copyright infringement, but who reasonably and in good faith believes the contrary, is not 'willful' for these purposes.

*Princeton Press*, 99 F.3d at 1392. Priddis contends that its belief that it was not infringing plaintiffs' copyright interests was reasonable because it was based on the existence of the HFA licenses, as well as industry custom.  While Priddis does not identify the particular industry custom upon which it reasonably relied, the court assumes Priddis is referring to its belief that the use of the subject compositions as "free samples" sheltered it from royalty obligations.

Here, the plaintiffs have presented sufficient evidence to create a genuine issue of fact as to whether Priddis' conduct constituted willful copyright infringement.  First, there is evidence from which a reasonable trier of fact could find that defendant Priddis itself knew of the need to obtain a license to cover the challenged uses and thereby conclude that Priddis' belief that the initial HFA licenses covered its conduct in connection with the Barbie® compilations was unreasonable.  It is undisputed that Priddis sought additional HFA licenses (the "retroactive

23

licenses") to specifically cover the Barbie® compilations.

 With respect to defendant Priddis' arguments regarding industry custom, there is sufficient evidence from which a jury could find that Priddis' reliance thereon was neither reasonable nor in good faith. In deposition testimony, Richard Priddis acknowledged that a letter he wrote to KIDdesigns stated that "Publishers would also like to be paid a royalty for every tape and C.D., whether sold or handed out as a sample. However, the long-standing practice in the karaoke industry is to pay on product sold, not on samples bundled with karaoke players." (Pridis Depos. at p. 121) Yet, the only evidence presented by defendant Priddis in support of this allegedly long-standing practice is less than persuasive. See Docket No. 167, Exhibit I, Deposition of James H. Scott, at pp. 80–81 (bundling promotional copies of music with other unrelated products is a common occurrence in the music industry, but only in highly limited quantities, and the circumstances under which this music is given away is usually one in which it is given to the press or the radio industry to encourage positive reviews and air play). Thus, while Priddis acknowledged that publishers would find its actions infringing, Priddis relied upon a dubious industry practice to justify its actions. Under these circumstances, the court finds that there exists at least a genuine issue of fact as to whether Priddis' belief was both reasonable and in good faith.

 5. *Equitable Estoppel*

 Priddis' final argument is based on a theory of equitable estoppel. Priddis maintains that, because it has been allowed to cure alleged incidences of infringement in the past by obtaining retroactive licenses and paying royalties to these plaintiffs, the plaintiffs should be estopped from bringing a claim of infringement against them. According to Priddis, the plaintiffs should not be

permitted to "unilaterally change" the established karaoke industry practice of "infringe first, license second."[16]

To establish a defense of estoppel, four elements must be present: "(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." *Hampton v. Paramount Pictures Corp*., 279 F.2d 100, 104 (9th Cir. 1960). "For estoppel to apply in a copyright action, the copyright owner must be aware of the infringing conduct and yet act in a way that induces the infringer reasonably to rely upon such action to his detriment." *Chi-Boy Music v. Charlie Club Incorp*., 930 F.2d 1224, 1228 (7th Cir. 1991). In this case, Priddis has presented no evidence that the plaintiffs were aware of the infringement at issue and yet acted in a way that would mislead Priddis with respect to that infringement.[17] Evidence of

---

[16]The expert testimony submitted by Priddis regarding custom and usage of the karaoke music industry is the subject of a Motion to Exclude, based upon Federal Rules of Evidence 702, 703, and 403, filed by the plaintiffs on April 20, 2005. (Docket No. 143, "Motion to Exclude Report and Testimony of Dara Lupowitz") Contrary to the plaintiffs' assertion, however, Priddis does not rely, in its Motion for Summary Judgment, upon the testimony of its marketing expert, Dara Lupowitz, for the proposition "that the custom and usage in the karaoke business is to give away 'free samples' of the karaoke companies' musical products, such as the Priddis sound-alike recordings, with karaoke machines that are sold to consumers." *Id*. at p. 4. Indeed, the Lupowitz report contains no such assertion.

Regardless, the court finds that the crux of the Motion is directed to the weight, rather than the admissibility, of the expert report and testimony and is, therefore, not proper for disposition on a Motion to Exclude. Moreover, the plaintiffs' conclusory arguments for exclusion pursuant to Rules 702, 703 and 403 are similarly inappropriate, as well as premature, grounds for the exclusion of evidence filed in support of a motion for summary judgment. For these reasons, the court reserves its judgment in this regard for when the issue is ripe.

[17]To the contrary, the evidence establishes that, on May 23, 2003, plaintiff Warner/Chappell Music contacted defendant Mattel by letter to voice its concern that the use of the musical composition "The Way You Love Me" on the cassettes and CDs distributed with the

25

past settlements entered into by HFA and/or the plaintiffs against alleged infringers or evidence of a general policy favoring the settlements of these infringement disputes is insufficient to succeed on this defense.

In conclusion, the Motion for Summary Judgment filed by defendant Priddis against the plaintiffs will be denied.

B.    Plaintiff's Rule 11 Motion for Sanctions Against Defendant Priddis

The plaintiffs have moved for sanctions against defendant Priddis, pursuant to Federal Rule of Civil Procedure 11(b) and (c), in connection with Priddis' pleadings in this case, including its Answers to plaintiff's Complaint as well as its briefs and fillings in support of its Motion for Summary Judgment.  (Docket No. 209)  Plaintiffs contend that Priddis' pleadings violate Rule 11 because they contain legal contentions not warranted by existing law or non-frivolous argument for the extension, modification, or reversal of existing law, or the establishment of new law.  *Id*. at ¶ 1.  Plaintiffs also assert that these pleadings contain specious factual contentions and repeated denials or assertions of lack of knowledge where such information was indeed possessed.  *Id*.

The appropriate test for the imposition of Rule 11 Sanctions is whether the attorney's conduct was objectively reasonable under the circumstances.  *Nieves v. City of Cleveland*, 03 CV 4000,  2005 WL 2033328 at *3 (6th Cir. Aug. 24, 2005) (citing *Jackson v. Law Firm of O'Hara,*

_____

disputed products had not been properly authorized.  (Docket No. 120, Declaration of Isaac Ashkenazi, at ¶ 11) On June 2, 2003, Mattel referred the correspondence to KIDdesigns for response, and KIDdesigns responded on June 3, 2003.  *Id*.  On August 27, 2003, Priddis wrote KIDdesigns requesting that, "due to copyright issues," it discontinue the use of all Priddis recordings in connection with the Barbie karaoke players.

26

*Ruberg, Osborne and Taylor*, 875 F.2d 1224, 1229 (6ᵗʰ Cir. 1989). A district court has broad

discretion in determining whether a sanction is warranted and, if so, what sanction is appropriate.

*Id*.

As the Sixth Circuit recently explained, "Rule 11 generally requires an attorney to

conduct a reasonable inquiry into the relevant law and facts before signing pleadings, written

motions, or other documents, and it prescribes sanctions for violations of these obligations."

*Nieves*, 2005 WL at *3. Rule 11(b) specifically provides:

> (b) Representations to the Court. By presenting to the court (whether by signing,
> filing, submitting, or later advocating) a pleading, written motion, or other paper,
> an attorney or unrepresented party is certifying that to the best of the person's
> knowledge, information, and belief, formed after an inquiry reasonable under the
> circumstances,--
>     (1) it is not being presented for any improper purpose, such as to harass or
> to cause unnecessary delay or needless increase in the cost of litigation;
>     (2) the claims, defenses, and other legal contentions therein are warranted
> by existing law or by a nonfrivolous argument for the extension, modification, or
> reversal of existing law or the establishment of new law;
>     (3) the allegations and other factual contentions have evidentiary support
> or, if specifically so identified, are likely to have evidentiary support after a
> reasonable opportunity for further investigation or discovery; and
>     (4) the denials of factual contentions are warranted on the evidence or, if
> specifically so identified, are reasonably based on a lack of information or belief.

Fed. R. Civ. Pro. 11(b).

The court finds that, under the circumstances, Priddis' conduct was objectively

reasonable and, thus, not deserving of Rule 11 sanctions, with the exception of one egregious

representation. In signing its Notice of Filing in Support of Motion for Summary Judgment

against Plaintiffs (Docket No. 124), Priddis represented to the court that it was submitting full

and complete copies of the HFA licenses obtained by Priddis, the existence of which was relied

upon by Priddis in support of its Motion for Summary Judgment. However, Priddis failed to

27

provide the court with the full text of the terms and provisions of the HFA licenses obtained for use of the subject compositions, completely omitting the reverse side of the licenses, despite the fact that the front portion of the license explicitly states that it is only "supplementary" to the provisions stated on the reverse side.

Under these circumstances, no reasonably prudent attorney would have submitted to the court only the front portion of the license, while simultaneously representing that the license contained in its filing was whole.  Priddis' factual contention that these licenses were complete and its related legal contention that they authorized its conduct were not reasonably warranted by the evidence and, therefore, violated Rule 11(b)(3).  In response to plaintiffs' Rule 11 Motion for Sanctions, Priddis offers no justification or innocent excuse, such as a mistake in copying, for its inclusion of only the front provisions of the HFA licenses. The court can only conclude that this pleading was calculated to conceal from the court certain crucial provisions of the licenses upon which Priddis' Motion for Summary Judgment in part relied.  Such conduct is not be taken lightly, whether intentional or not.  Appropriate sanctions will be determined and issued against Priddis by separate order.


C.      Mattel's Motion for Summary Judgment Against the Plaintiffs

While the plaintiffs originally indicated that defendant Mattel should be held liable for direct, contributory, and vicarious copyright infringement, plaintiffs now argue that Mattel's Motion for Summary Judgment should be denied based solely on the theories of contributory and vicarious liability.

1. *Contributory Copyright Infringement*

28

While liability for direct infringement arises from the violation of any one of the exclusive rights of a copyright owner, 17 U.S.C. § 501(s), such as the exclusive right of an owner of copyright in a musical composition to, and to authorize others to, reproduce, distribute, perform, display, and prepare derivative works from the copyrighted composition, 17 U.S.C. § 106, liability for contributory infringement is based on the defendant's relationship to the direct infringement. *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir. 2004). In the Sixth Circuit, "[c]ontributory infringement occurs when one 'with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another." *Id.* (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc*., 443 F.2d 1159, 1162 (2d Cir. 1971)). Mattel does not dispute that KIDdesigns directly infringed upon plaintiff's copyright. However, Mattel maintains that it cannot be held liable for the infringement based upon a theory of contributory infringement because it did not have knowledge of the direct infringement, nor did it substantially participate in the infringing activity. (Docket No. 117)

With respect to the element of knowledge, contributory liability requires that the secondary infringer 'know or have reason to know' of the direct infringement. *A & M Records, Inc. v. Napster, Inc*., 239 F.3d 1004, 1020 (9th Cir. 2001) (quoting *Cable/Home Communication Corp. v. Network Prods., Inc*., 902 F.2d 829, 845 n. 29 (11th Cir. 1990). Thus, to prove contributory liability, the knowledge may be either actual or constructive. The plaintiffs contend that Mattel either knew or had reason to know that KIDdesigns was infringing upon its copyrights because: (1) "from the outset of the project involving the Barbie® electronic toys, the desire of KIDdesigns to avoid paying copyright royalties was made known to Mattel in various

29

emails;" (2) the two pieces of documentation that Mattel received from KIDdesigns concerning Priddis' purported grant of authority to KIDdesigns to use the subject compositions with the disputed products put, or should have put, Mattel on notice that Priddis lacked the authority it claimed to possess; and (3) Mattel is a sophisticated party, familiar with the licensing of intellectual property, and had a duty to ask for copies of Priddis' licenses or refuse to approve the inclusion of any musical compositions until appropriate licenses could be produced. (Docket No. 159)

In support of its first argument, plaintiffs cite, without explanation, to an email, dated December 19, 2000, in which Isaac Franco of KIDdesigns responds to questions posed by Bill Bertini of Mattel at the inception of the planning for the disputed products. (Docket No. 153 at Exhibit 12) In response to Mattel's inquiry into whether it would make sense to try and clear rights to Barbie® music, in order to maintain the "Barbie connection" with the disputed products, KIDdesigns stated that, "We would consider using [the Barbie® music] if it was royalty free." *Id*. However, the fact that KIDdesigns made known its desire to avoid paying royalties on Barbie® music to Mattel, the owner of the Barbie® trademark, does not create a genuine issue of fact as to Mattel's knowledge concerning the subject compositions at issue here.

This email does demonstrate that Mattel was aware of the potential copyright issues related to musical clearances and sought assurances, early on, that the issue would be addressed. One of Bertini's questions concerned how royalties would be paid to "song-writers, etc." for use of any copyrighted works distributed with the disputed products.[18] In response, Franco

---

[18]Bertini wrote:
Isaac F. indicated that a lot of other karaoke companies use sound alikes duplicating the *music* of popular songs to avoid paying royalties to the actual

30

represented that KIDdesigns "would handle all the legalities to clear both KD and Mattel." Had Mattel merely relied upon this response, a reasonable juror may have been able to conclude that Mattel was "willfully blind," and, thus, knowledgeable, of KIDdesigns' potentially infringing behavior. *See In re: Aimster Copyright Litigation*,334 F.3d 643, 650 (7th Cir. 2003) ("willful blindness is knowledge in copyright law... as it is in the law generally."). Yet, it is undisputed that Mattel sought further information and, on two occasions, requested documentation concerning the relationship between KIDdesigns and Priddis. (Docket No. 154 at ¶ 23) The first occurred in early 2001, when Mattel asked KIDdesigns to confirm that the use of the planned musical compositions with the disputed products would be properly authorized. *Id*. at ¶ 24. In response, KIDdesigns provided Mattel with a copy of a January 30, 2001 letter from Priddis to KIDdesigns in which Priddis stated that it "holds mechanical licenses for the reproduction of the songs used in the bundles CDs or cassettes," and "will allow your company to duplicate the approved songs on CD and/or Cassettes." *Id*. The letter also stated that Priddis had "the sole responsibility for the payment of any royalties on bundled songs as may be required under its licensing contracts and within the customs of the industry." *Id*. at ¶ 25. Several months later, Mattel asked for confirmation, in connection with a television commercial for one of the disputed products, the "Barbie® Sing-With-Me Karaoke Machine," that certain musical compositions contained on the master DAT recordings provided to KIDdesigns by Priddis could play in the background of the commercial. *Id*. at ¶ 26. In response, by letter dated May 29,

---

artists. If this is the case, what about royalties to song-writers, etc.? Do these sound alike services or companies take care of that? Do they indemnify KD and Mattel?

(Docket No. 152, Exhibit 12)

2001, Priddis stated that KIDdesigns had permission to use samples of Priddis' recordings in the commercial. (Docket No. 120, Exhibit H)

As stated above, the plaintiffs contend that the two pieces of documentation that Mattel received from KIDdesigns concerning Priddis' purported grant of authority to KIDdesigns to use the subject compositions with the disputed products put, or should have put, Mattel on notice that Priddis lacked the authority it claimed to possess. With respect to the initial January 30, 2001 letter, the plaintiffs argue that, because this letter indicates that Priddis' purported authority derives from mechanical licenses issued by HFA, Mattel, who obtained mechanical licenses from HFA three years earlier, in 1998, should have known that the licenses did not authorize Priddis' conduct. This argument falls flat because, even assuming Mattel's prior association with HFA would have been sufficient to establish its constructive knowledge of the infringing activity, nothing in the letter actually states that Priddis' rights were in any way associated with HFA. The plaintiffs do not state how the second letter may have given Mattel actual or constructive knowledge of the infringing activities of KIDdesigns, which was not involved in the production of the subject television commercial.

Finally, the plaintiffs assert that Mattel's knowledge has been established because, given Mattel's status as the world's largest toy maker, it is "inconceivable" that it would have relied solely upon Priddis' representations and that it had an independent duty to obtain copies of the HFA licenses granted to Priddis. Yet, in this particular instance, Mattel's role was that of a mere trademark licensor who had no reason not to rely upon the representation of Priddis that it would pay any copyright royalties owed. Significantly, the plaintiffs reference no authority that would impose a duty upon a trademark licensor to obtain copies of mechanical licenses relating to the

32

underlying project, nor is the court aware of any.

Based upon the record before it, the court finds that there are no genuine issues of material fact as to Mattel's knowledge. Because the court finds that no genuine issues of material fact remain as to Mattel's knowledge, it need not reach the issue of substantial participation, and Mattel's Motion for Summary Judgment will be granted as to the plaintiffs' contributory liability theory of copyright infringement. However, because material issues of fact remain as to plaintiff's claim against Mattel under the theory of vicarious liability, this portion of the Motion will be denied.

2. *Vicarious Copyright Infringement*

"Vicarious copyright liability is an "outgrowth" of the common law doctrine of *respondeat superior*, which holds the employer liable for the acts of its agents." *Gordon v. Nextel Communications and Mullen Advertising, Inc.*, 345 F.3d 922, 925 (6th Cir. 2003). In the vicarious liability context, lack of knowledge of the infringement is irrelevant. *Id.* However, a defendant can be held vicariously liable only if it: (1) enjoys a direct financial benefit from the infringing activity; and (2) has "the right and ability to supervise" the infringing activity. *Bridgeport*, 376 F.3d at 621. For purposes of summary judgment, Mattel concedes that it had the right and ability to supervise the infringing activity. Thus, the only remaining dispute concerns Mattel's direct financial interest in the infringing activity.

It is undisputed that Mattel received royalties, calculated as a percentage of KIDdesigns' gross sales of the disputed products, less returns, allowances, and other adjustments, in exchange for its agreement to allow KIDdesigns to use its Barbie® trademark in connection with the disputed products. (Docket No. 154 at ¶ 47) This royalty rate ranged from 11–12 % for "role

33

play" toys, like the Barbie® Sing-with-Me Karaoke Machine (Model No. BE-477), and between 6.5–8 % for the other disputed products. (*Id*. at ¶ 48; Docket No. 117 at p. 11, ftn. 5) Between May 2001 and December 2003, when the disputed products were sold, Mattel received gross royalties in the amount of approximately $6.89 million dollars. (Docket No. 119, Exh. C at ¶ 8) Despite Mattel's receipt of substantial royalties from the sales of the disputed products, it asserts that, because there is no evidence that the cassettes and CDs included in the disputed products specifically generated this revenue for Mattel, it has enjoyed no direct financial benefit from the infringing products. In other words, Mattel maintains that there is no evidence that the inclusion of the infringing cassettes or CDs was in any way a "draw" for consumers interested in the disputed products and, therefore, Mattel received no financial benefit from them. According to Mattel, because there was no separate charge for the cassettes or CDs and because the consumers who purchased the disputed products were free to use any pre-recorded cassettes they elected to use, the entire financial benefit Mattel received in connection with the disputed products was generated solely by its contribution of the Barbie® trademark. (Docket No. 117 at p. 11)

Mattel's argument is defective for a number of reasons. To begin, its assertion that the inclusion of music in the karaoke and audio products at issue here was not a "draw" for consumers could only kindly be categorized as nonsensical, and less kindly categorized as disingenuous. The court declines to so separate the music from the machine and engage in the type of hair-splitting promoted by Mattel. In the words of Isaac Ashkenazi, the President of KIDdesigns, "it made all the sense in the world to have a sing-along music product contain music and a microphone because you can't sing along without it." (Docket No. 152, Exh. 14, Ashkenazi Depos. at p. 146) A Vice-President of KIDdesigns, Isaac Franco, similarly

34

recognized the value of including cassettes and CDs with the disputed products. In an email

dated March 25, 2002, and addressed to Bill Bertini of Mattel, Franco informed Mattel that:

> We are considering updating the songs for the Karaoke. There are always new hot
> artists and we feel it may pay to have the latest and greatest songs on the Karaoke
> tapes we are including with the product.[19]

(Docket No. 152, Exh. 14)  The perceived value of the infringing materials was made well

known to the consumers, as their inclusion was prominently marketed on the external packaging

of the disputed products.  (Docket No. 152, Exh. 6)  Under these facts, there is at least a genuine

issue of fact as to whether the inclusion of the infringing cassettes and CDs enhanced the

attractiveness of the disputed products and served as a "draw" to purchasing customers.

In addition, the two Ninth Circuit cases cited by defendant Mattel for the proposition that

the infringing cassettes and CDs must be a "draw" for consumers in order to find a direct

financial benefit, *Fonovsia, Inc. v. Cherry Auction*, 76 F.3d 259, 263 (9th Cir. 1996) and *A & M

Records, Inc. v. Napster, Inc*., 239 F.3d 1004, 1022 (9th Cir. 2001), are distinguishable because

those cases involved situations where the defendant received no direct revenues or commissions

whatsoever from the direct infringer's sale of the infringing products.[20]  Where, as here,

---

[19]Indeed, one of the songs specifically mentioned in the email as one of the "latest and greatest" was "We are Family," one of the subject compositions at issue here.  *Id.*

[20]In *Fonovsia*, for example, defendant Cherry Auction operated a "swap meet," whereby customers came to purchase various merchandise from individual vendors.  76 F.3d at 261.  In exchange for booth space, the vendors paid Cherry Auction a daily rental fee.  *Id.*  In addition to the booth space, Cherry Auction provided parking, conducted advertising and retained the right to exclude any vendor for any reason.  From each customer attending the swap meet, Cherry Auction received an entrance fee.  The court, in concluding that Cherry Auction could be held vicariously liable for the sale by swap meet vendors of infringing recordings, rejected the defendant's contention that receipt of a commission, directly tied to the sale of particular infringing items, was necessary to satisfy the financial benefit prong of vicarious liability.  The court found that Cherry Auction received a direct financial benefit because it "reap[ed]

35

defendant Mattel received substantial royalties for the sale of the disputed products, of which the infringing materials were part and parcel, the plaintiffs need not independently establish that the infringing materials were a "draw."  *See Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963) (concluding that the defendant, an owner of a chain of department stores, had a direct financial interest in the infringing activity of a concessionaire based on its receipt of a percentage of the concessionaire's sales).  The fact that the defendants may have conceptualized the cassettes and CDs as "free" is irrelevant.   Mattel's request for summary judgment as to the plaintiff's vicarious liability claims will, therefore, be denied.

D.      Cross-motions for Summary Judgment By Defendants KIDdesigns and Priddis

On January 12, 2004, KIDdesigns filed cross-claims against Priddis, alleging that Priddis agreed to indemnify KIDdesigns against any and all liability for copyright infringement and/or the payment of royalties owed on or in connection with the songs licensed by Priddis to KIDdesigns.  (Docket No. 39 at ¶ 21)  KIDdesigns also claims that Priddis breached the contract it entered into with KIDdesigns by making false warranties and representations that it was fully authorized to license KIDdesigns to distribute the CDs and cassettes containing the subject compositions.  *Id*. at ¶¶ 25, 26.  On April 1, 2005, both KIDdesigns and Priddis moved for summary judgment as to these cross-claims.  (Docket Nos. 108, 122)

According to KIDdesigns, the contract between itself and Priddis was formed on January 30, 2001, when Priddis transmitted its contract proposal to KIDdesigns, and KIDdesigns

---

substantial financial benefits from admission fees, concession stand sale and parking fees, all of which flow directly from customers who want to buy the counterfeit recordings at bargain basement prices."  *Id*. at 263–64.

manifested its acceptance of that proposal by beginning the process of launching the disputed products. (Docket No. 110 at p. 10) Thus, KIDdesigns asserts that the terms of the January 30, 2001, letter control. According to KIDdesigns, this letter establishes that Priddis agreed to hold KIDdesigns harmless from any liability for copyright infringement relating to the subject compositions. KIDdesigns claims that the undisputed $3.8 million it has paid in back royalties to non-party music publishers for sales of the disputed products, in exchange for a full release of the non-party music publishers' claims, are of the sort covered by Priddis' indemnity.[21] In response, Priddis argues, first, that the January 30, 2001, letter was a part of continuing negotiations such that no meeting of the minds occurred; and, second, that it was not an offer capable of acceptance. (Docket No. 166) In the alternative, Priddis argues that any contract between the parties is not enforceable due to inadequacy of consideration, as well as material mistake. *Id*.

The parties agree, for purposes of summary judgment, that New Jersey law controls here. (Docket No. 166 at p. 2, ftn.1) Under New Jersey precedent, the creation of an offer capable of acceptance "depends not upon what [the potential offeror] intended to say or upon what [the potential acceptor] believed [the potential offeror] meant, but rather upon what mening [sic] the words should have conveyed to a reasonable person cognizant of the relationship between the parties and all of the antecedent and surrounding facts and circumstances." *Esslinger's Inc. v.*

––––––––––––––––––

[21]Because the amount of damages KIDdesigns will pay to the plaintiffs is yet to be determined, however, KIDdesigns requests that the entry of final judgment against Priddis on these cross-claims should await the final calculation of such damages, with that amount to be added to the $3.8 million sum. (Docket No. 110 at p. 14) Priddis does not dispute, for purposes of summary judgment, that the amount of back royalties KIDdesigns paid to these non-party music publishers was reasonable under the circumstances. (Docket No. 168 at ¶ 11)

*Alachnowicz*, 68 N.J. Super. 339, 344 (App. Div. 1961). Thus, in order to determine whether the January 30, 2001, letter was an offer capable of acceptance, the court must first examine the facts and circumstances that preceded it.

It is undisputed, for purposes of summary judgment, that in or about December 2000, KIDdesigns began planning to launch the disputed products, one of which would be a karaoke machine, and that KIDdesigns was considering the possibility of distributing cassettes, CDs, and accompanying lyric booklets containing familiar musical compositions as "gifts with purchase." (Docket No. 168 at ¶ 31) At this time, Peter Felberbaum of KIDdesigns contacted Richard Priddis to see if Priddis Music could be of assistance with the project, and Priddis responded enthusiastically to the idea and indicated that he would be happy to assist. *Id*. at ¶¶ 32, 33. According to the deposition testimony of Richard Priddis, Felberbaum specifically indicated that the budget for these planned products would not permit them to pay anything for the "samples" provided by Priddis. (Priddis Depos. at pp. 51–52) Priddis admits telling KIDdesigns that royalties to music publishers would not be required on promotional, free samples, such as the ones Priddis was providing. (Docket No. 168 at ¶ 36) Priddis explained to Felberbaum that, if the cassettes, CDs, and lyric booklets were "bundled" with the planned Barbie® products and packaged and labeled separately, they would be considered "samplers" within the customs and practices of the karaoke music industry, thereby qualifying as promotional items that did not trigger any royalty obligation to copyright owners. *Id*. at ¶ 37. On December 21, 2000, Priddis sent Felberbaum a letter confirming the "sampler" concept and assuring that Priddis would have its attorney "send [Felberbaum] a letter indemnifying [KIDdesigns] from any legal responsibility

38

regarding licenses." *Id*. at ¶ 39.[22]

In January of 2001, Felberbaum requested that Priddis provide a letter from its counsel confirming that: (1) Priddis was authorized to make available to KIDdesigns master recordings containing musical compositions that would be used in connection with the Barbie® project; (ii) neither KIDdesigns nor Mattel would be responsible for the payment of any royalties that might be owed for the use of these musical compositions; and (iii) Priddis would fully indemnify KIDdesigns and Mattel against any claims that might be asserted in connection with the use of these musical compositions. *Id*. at ¶ 40. On January 15, 2001, Felberbaum received an e-mail from Richard Priddis, in which Priddis informed Felberbaum that he had spoken with his counsel concerning the letter that Felberbaum had requested, and that his counsel suggested that KIDdesigns send a proposal letter outlining what it wanted from Priddis, to which Priddis' counsel would respond. *Id*. at ¶ 41. Priddis included in the e-mail a draft of the proposal letter that his attorney had requested "with the information I think should be included, to make it easier on you." The letter Priddis drafted for KIDdesigns requested that Priddis' counsel:

> provide [KIDdesigns] with a letter granting our company permission to use your
> recordings... without fee or obligation... The letter should express the opinion that,
> as a free promotional item, the recordings will be free of any copyright liability,
> specifically regarding any obligation to specially license the songs or pay a fee or
> royalty of any kind to the copyright owners. The letter should indicate that your
> company has obtained proper licenses for the mechanical reproduction, reprint of
> lyrics, and resale of the recordings in a karaoke format. Please indicate that our
> company is indemnified from any responsibility regarding licensing, royalties,
> and liability regarding the recordings.

*Id*. at ¶ 42. Felberbaum had this draft proposal letter printed out, signed, and sent back to Priddis

---

[22]While Priddis disputes that any attorney letter was ever drafted by counsel, it does not dispute making this representation. *Id*. at ¶ 39.

two days later, on January 17, 2001. *Id*. at ¶ 41.

On January 30, 2001, Priddis sent Felberbaum a letter, signed by Priddis, which, states that "Our company has been bundling CDs and cassettes with karaoke players for years. It is common practice in other industries. To date, we have never had any problem with copyright owners." The letter also states that "Priddis Music has responsibility for the payment of any royalties on bundled songs under the terms, contracts, and customs of the industry," and represented that its actions are subject to audit by all the licensing agencies. Having stated these things, Priddis informed KIDdesigns that:

> Priddis Music submits this letter as the basis for establishment of a contractual relationship with your company and sets forth the following statement of the position of Priddis Music.
> Priddis Music:
> 1) holds mechanical licenses for the reproduction of songs used in the bundled CDs or cassettes;
> 2) pays royalties on sales on a quarterly basis;
> 3) has the sole responsibility for the payment of any royalties on bundled songs as may be required under its licensing contracts and within the customs of the industry;
> 4) will hold your company harmless of any responsibility regarding the licensing and payment of royalties;
> 5) will maintain sole and exclusive control over all design, art, and packaging of CDS and cassettes;
> 6) will require that each CD and cassette be limited to between four and ten songs each;
> 7) will allow your company to duplicate the approved songs on CD and/or Cassettes and print the approved artwork required for insertion into your packaging in the country of origin for the manufacture of your product;
> 8) will require that your company report to Priddis Music the total quantity of CDs and/or Cassettes duplicated and shipped.

Finally, the letter states that, "In addition to this letter, Priddis Music requests your input, questions, and will execute such formal contracts, as your company may deem suitable. Please let me know if this is something upon which we may immediately move forward."

40

In light of all the surrounding circumstances, the language of the January 30, 2001, letter would have conveyed to a reasonable person that Priddis was making an offer capable of acceptance by KIDdesigns. KIDdesigns, in turn, accepted this offer by commencing the development, manufacturing, and launching of the disputed products. In New Jersey, an offeree may manifest its assent either through words or through beginning performance of essential terms of the proposal. *Graziano v. Grant*, 326 N.J. Super 328, 339 (App. Div. 1999) (citing *Weichert Co. Realtors v. Ryan*, 128 N.J. 427. 436 (Sup. Ct. N.J. 1992). "Acceptance may come either from words, creating an express contract, or from conduct, creating a contract implied in fact." *Id*. 326 N.J. Super. at 340. Moreover, "[a]n offer which invites acceptance by performance, rather than promissory acceptance, will give rise to a binding contract when an offeree begins the invited performance or tenders part of it." *Assoc. Group Life, Inc. v. Catholic War Veterans of the U.S.*, 120 N.J. Super 85. 95 (App. Div. 1971). Here, Priddis invited KIDdesigns to accept its proposal by performance, advising KIDdesigns that it was open to moving forward immediately and that it was submitting the letter as a basis of their contractual relationship. KIDdesigns did just that by asking for and accepting the master DAT recordings from Priddis and beginning the process of manufacturing and reproducing the cassettes and CDS to be included with the disputed products.

It is undisputed that, between January 30, 2001, and May 2001, Priddis supplied the necessary master recordings and song lyrics.[23] The products and the cassettes to be distributed

---

[23]By letters dated March 19, July 10, July 31, and April 9, 2003, Priddis also wrote to KIDdesigns' affiliate manufacturer in Hong Kong, Viderex International, Ltd., stating that "[a]ccording to our agreement, we give approval to have these songs reproduced on cassette, worldwide."

with them were manufactured at KIDdesigns' direction, and the first of the new line of Barbie®

electronic products were introduced into the marketplace in May of 2001. *Id.* at ¶ 48. The

exterior packaging for the disputed products contained a notice identifying Priddis as the source

of the music on the accompanying cassettes or CDs and promoting Priddis' business. *Id.* at ¶ 49.

Under these facts, it cannot seriously be argued that Priddis lacked sufficient notice of

KIDdesign's acceptance of their proposal.

Thus, the January 30, 2001, letter gave rise to a contract, the terms of which bind Priddis

and KIDdesigns. Because the language of the January 30, 2001, agreement unambiguously

establishes a duty on the part of Priddis to "hold [KIDdesigns] harmless of any responsibility

regarding the licensing and payment of royalties," KIDdesign's Motion for Summary Judgment

on its indemnification claim will be granted, and Priddis' Motion for Summary Judgment as to

this claim will be denied.[24]

With respect to KIDdesign's claim against Priddis for breach of contract, however, the

court finds that summary judgment should be granted in favor of Priddis. This breach of contract

claim is entirely duplicative of KIDdesign's indemnification claim, and KIDdesigns has failed to

assert any additional damages resulting from the alleged breach and not covered by the terms of

the indemnification provision. Priddis' Motion for Summary Judgment will be granted as to the

breach of contract claim.

_____

[24]Priddis' argument in opposition to KIDdesign's Motion for Summary Judgment does
not include a contention that the terms of the January 30, 2001, letter fail to create an
indemnification obligation on the part of Priddis. Rather, Priddis contends only that the January
30, 2001, letter is not an enforceable, binding contract. Any such argument has been carefully
considered by the court and rejected.

42

E.    Plaintiff Follese's Motion to Reopen Discovery

1. *Background*[25]

On November 23, 2004, plaintiff Keith Follese, a songwriter, gave a deposition in this case.  During the deposition, Follese discussed a pending offer from Ten Mex Music to purchase the publisher's share of Follese's music catalogue.  The sale was to include the song "The Way You Love Me," which was used in the disputed products in this litigation.  The purchase price was to be calculated as follows: Ten Tex would pay a multiple of the net publisher's share (NPS) of royalties that Follese had received for his works in the preceding three years.[26]  The sale to Ten Tex did not actually take place, as it appears that negotiations broke down.

Follese then sold his song catalogue to another buyer, Ole Media Management, LP, Ontario Canada, for a lower price.[27]  The agreement between Follese and Ole Media states that the sale price was calculated as follows:

> a dollar figure to be determined, calculated at a multiple of six (6) based upon the verified NPS of the portion of the Assets set forth in (1)(a) and (1)(c) above (verification being based upon the average one year income from years 2002 and 2003 and based on two times the first six months of 2004 such that a total estimated 2004 annual NPS is used), which shall be reduced by any unearned balances of any advances that are recoupable against royalties deriving from the Assets.

---

[25]Unless otherwise noted, these facts are drawn from Plaintiff Follese's Motion to Reopen Discovery for Limited Disclosure (Docket No. 175), the Declaration of Keith Follese (Docket N. 176), and the Declaration of Paul Harrison Stacey, counsel for the plaintiff (Docket No. 175, Attach. 2).

[26]Follese, as publisher of the music, receives a share of the royalties for the use of his song.  When a music catalogue is sold, the purchase price is determined by how much the publisher has earned in royalties.

[27]The agreement between Follese and Ole Media was attached to the Response of defendants KIDdesigns and Mattel.  (Docket No. 201, Exhibit C)

43

(Docket No. 201, Exhibit C). The assets set forth in (1)(a) and (1)(c) include the song "The Way You Love Me."

The sale closed on February 24, 2005. The discovery deadline in this litigation was March 15, 2005. Follese claims that he was unaware of the approaching discovery deadline at the time of the sale. He transmitted the majority of the pertinent documents to his attorney, Paul Harrison Stacey, on March 29, 2005. Mr. Stacey notified Bruce Ewing, counsel for Kiddesigns and Mattel, about the sale on March 30, 2005 during settlement discussions. He told Gary Pierce, associate counsel for Priddis, on April 11, 2005 during a discussion about a sanctions motion filed by Follese against Priddis. He sent all of the documents to defendants on April 14, 2005, along with a letter explaining the sale. (Docket No. 176, Exhibit A)

Because plaintiff Follese did not receive a formal response from the defendants to his letters, Follese filed a motion in this court to reopen discovery so that the disclosure of the documents relating to the Ole Media sale would be deemed timely. In his Motion to Reopen Discovery, plaintiff Follese asks for discovery to be reopened for the "sole and limited purpose" of allowing the disclosure of the documents regarding the sale between Follese and Ole Media so that he will be permitted to seek the additional damages arising from the reduced sale price of the publisher's sale of his catalog relative to the composition "The Way You Love Me," a subject composition in this lawsuit. Follese estimates that his additional actual damages caused by the reduced purchase price of his music catalogue are around $260,000. In the alternative, plaintiff asks that he not be precluded from asserting these damages in a separate lawsuit.

2. *Merits*

Defendants Priddis, KIDdesigns, and Mattel argue vehemently that plaintiff Follese's

Motion to Reopen Discovery should have been brought as a Motion to Amend under Federal Rule of Civil Procedure 15(a). The defendants contend that what Follese is now seeking, by virtue of his Motion to Reopen Discovery, are special, not actual, damages. Because special damages must be specifically alleged under Federal Rule of Civil Procedure 9(g), the defendants assert that Follese's motion is really a motion to amend the complaint, under Federal Rule of Civil Procedure 15(a), to add special damages as a theory of recovery. According to the defendants, the motion should be assessed under Rule 15(a) standards, which provide that a motion to amend should be denied where the proposed amendment would be futile. The defendants assert that, because the additional damages resulting from the reduced sale price of the song catalog are special damages that cannot fall within the category of "actual damages," pursuant to 17 U.S.C. § 504(a), the proposed amendment would be futile. The defendants conclude that the Motion to Amend should be denied, since special damages are not a form of recovery recognized under the Copyright Act, 17 U.S.C. § 504(b).

Whether styled as a Motion to Reopen Discovery or a Motion to Amend, plaintiff Follese's motion is well-taken. Pursuant to Section 504(b) of the Copyright Act, "[t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. Sec. 504(b). The damages sought by Follese resulted from an actual sale of a portion of his publisher's share of his music catalogue (as opposed to a hypothetical or speculative transaction), which took place on February 24, 2005. The sale price of the music catalogue was calculated, supposedly per industry custom, as a direct multiple of the amount of royalties Follese had garnered for use of

his works in the three preceding years. Had Follese received a higher amount of royalties from the use of his composition in the disputed products, there is a strong showing that the sale price of his catalogue would have increased correspondently.[28] Thus, the purportedly lower sale price that Follese allegedly received as a result of the defendant's failure to pay royalties due was actual damages suffered at the time of the sale. Whether or not the amount of these damages is too speculative to permit eventual recovery is a question of fact to be reserved for resolution at trial.[29]

While Follese requests the reopening of discovery for the sole purpose of allowing the documents regarding the sale to be considered timely, Follese also offers submission of a supplemental interrogatory explaining the calculation of the additional damages. The defendants, however, insist that further discovery would be necessary to defend against these damages. Specifically, the defendants claim that, in order to refute Follese's arguments that he would have received a higher purchase price for his song catalogue, had he received the royalties he claims were owed from the defendants, the defendants must be allowed to explore the

---

[28]In fact, all numbers are capable of being computed with mathematical certainty through the application of the express contractual provisions contained in the fully performed agreement between Follese and Ole Media.

[29]The defendants argue that the amount of damages suffered by Follese is speculative because: (a) it is not apparent from the agreement between Follese and Ole Media whether the composition was valued based on 2002-04 royalties or was valued based on 2004 royalties only, in which case there would be no damages suffered because there was no infringing activity in 2004 by the defendants; and (b) assuming the composition was based on 2002-04 royalties, it is uncertain whether Ole Media would have agreed to that method of valuation for the composition, had defendants paid the royalties owed. While these arguments may have merit, the defendants' other arguments, including its assertion that the damages suffered by Follese are wholly speculative since the defendants would not have included any copyrighted music with the disputed products if they had been aware of the need to pay publishing royalties, are entirely without merit.

46

circumstances under which the catalogue was sold, how the terms of the purchase were negotiated and what the eventual purchaser was willing to pay. To that end, the defendants request: (1) all documents from Follese concerning the purchase of his publishing catalogue and the negotiations with the purchase; (2) a deposition of Follese or his transaction counsel concerning the negotiations and explaining how "The Way You Love Me" came to be valued as it was; (3) letters rogatory to the relevant Canadian court seeking the production of documents from the catalogue's purchaser, which is apparently based in Canada; and (4) if necessary, a deposition of the catalogue's purchaser. (Docket No. 200 at p. 8) Should Follese's motion be granted, the defendants urge the court to permit this additional discovery, at Follese's expense.

While the defendants overstate the need for additional discovery, the court, in the interests of equity, concludes that the defendants should be provided a limited opportunity to engage in the additional discovery requested above, to the extent it is necessary. The court does not, however, believe there is just cause to impose the cost of such discovery solely on plaintiff Follese. Contrary to the defendants' assertions, these additional damages do not represent a drastic change from the plaintiff's original theory of recovery. Moreover, it appears from Follese's deposition testimony that the defendants were aware of the pending sale and the potential claim for additional damages as a result thereof, as early as November of 2004. Also, as the plaintiff points out, had Follese provided the sale documents on February 24, 2005, when the sale took place, defendant's access to the additional discovery now requested would have been severely limited, because there were only nineteen days remaining before the close of discovery. In view of all the surrounding circumstances, this is not a case that would justify placing the burden of expense upon the moving party.

47

### III. CONCLUSION

For these reasons, the following motions will be denied: (1) the Motion for Summary Judgment filed by defendant Priddis against the Plaintiffs; (2) the Motion to Strike Portions of the Badavas Declaration filed by defendant Priddis; and (3) the Rule 37(c)(1) Motion to Bar Evidence filed by the plaintiffs. In addition, the following motions will be granted: (1) Plaintiff Follese's Motion to Reopen Discovery; and (2) Plaintiffs' Rule 11 Motion for Sanctions against defendant Priddis.

Additional rulings will be made as follows: (1) the Motion to Exclude the Report and Testimony of Lupowitz filed by the plaintiffs will be denied in part, for purposes of ruling on the Motion for Summary Judgment, and reserved in part; (2) the Summary Judgment Motion filed by defendant Mattel will be granted as to plaintiffs' claim for contributory copyright infringement and denied with respect to plaintiffs' claim for vicarious copyright infringement; (3) the Motion for Summary Judgment filed by KIDdesigns against Priddis will be granted as to its cross-claim for indemnification and denied with respect to its cross-claim for breach of contract; and (4) the Motion for Summary Judgment filed by defendant Priddus as to KIDdesign's cross-claims will be denied as to KIDdesign's claim for indemnification and granted with respect to KIDdesign's claim for breach of contract.

An appropriate order will issue.

ALETA A. TRAUGER

United States District Judge

48